UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

MARIE RAYMOND,

       Plaintiff/Counter-Defendant,

                                    Civil Case No. 18-13760

v.                              Honorable Linda V. Parker

RENEW THERAPEUTIC
MASSAGE, INC., RENEW
THERAPEUTIC MASSAGE,
LLC, AND NATALIE CATT,

       Defendants/Counter-Plaintiffs.
_____/

## OPINION AND ORDER (1) DENYING PLAINTIFF/COUNTER-DEFENDANT'S MOTION FOR SUMMARY JUDGMENT [ECF NO. 34] AND (2) GRANTING IN PART AND DENYING IN PART DEFENDANTS/COUNTER-PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT [ECF NO. 33]

On December 4, 2018, Plaintiff Marie Raymond filed this suit against

Defendants alleging a violation of the Fair Labor Standards Act ("FLSA"), 29

U.S.C. § 201, et seq., and intentional infliction of emotional distress. (ECF No. 1.)

Defendants Renew Therapeutic Massage, Inc. and Renew Therapeutic Massage,

LLC (collectively, "Renew") are companies that connect disabled individuals

seeking massage therapy services with a licensed massage therapist ("LMT").

Defendant Natalie Catt is the owner of Renew. Raymond worked as an LMT for

Renew and alleges that the Defendants misclassified her as an independent contractor to avoid minimum wage and overtime obligations due under the FLSA.

On February 5, 2019, Defendants filed a countercomplaint against Plaintiff alleging a violation of Michigan's Uniform Trade Secrets Act ("MUTSA"), Mich. Comp. Laws. § 445.1901 et seq.  (ECF No. 6.)  The counterclaim arises from written employment agreements between the parties.  (*See* ECF Nos. 6-2, 6-3.)  Defendants generally allege that Raymond has solicited its affiliates, patients, and business contacts and violated the written agreements by using its confidential information.

The matter is presently before the Court on the parties' motions for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure.  (ECF Nos. 33, 34.)  Raymond is seeking summary judgment as to Defendants' counterclaims.  (ECF No. 34.)  Defendants are seeking summary judgment as to Raymond's claims.  (ECF No. 33.)  Raymond filed a response to Defendants' motion.  (ECF No. 37.)  However, Defendants did not file a reply brief.  Defendants' summary judgment motion is fully briefed.  (ECF Nos. 36, 38.)  Finding the facts and legal arguments sufficiently presented in the parties' briefs, the Court is dispensing with oral argument with respect to both motions pursuant to Eastern District of Michigan Local Rule 7.1(f).

I.      **Summary Judgment Standard**

Summary judgment pursuant to Federal Rule of Civil Procedure 56 is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  The central inquiry is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986).  After adequate time for discovery and upon motion, Rule 56 mandates summary judgment against a party who fails to establish the existence of an element essential to that party's case and on which that party bears the burden of proof at trial.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

The movant has the initial burden of showing "the absence of a genuine issue of material fact."  *Id*. at 323.  Once the movant meets this burden, the "nonmoving party must come forward with specific facts showing that there is a genuine issue for trial."  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (internal quotation marks and citation omitted).  To demonstrate a genuine issue, the nonmoving party must present sufficient evidence upon which a jury could reasonably find for that party; a "scintilla of evidence" is insufficient.  *See Liberty Lobby*, 477 U.S. at 252.  The court must accept as true the non-movant's evidence and draw "all justifiable inferences" in the non-movant's favor. *See Liberty Lobby*, 477 U.S. at 255.

3

"A party asserting that a fact cannot be or is genuinely disputed" must designate specifically the materials in the record supporting the assertion, "including depositions, documents, electronically stored information, affidavits or declarations, stipulations, admissions, interrogatory answers, or other materials." Fed. R. Civ. P. 56(c)(1). Notably, the trial court is not required to construct a party's argument from the record or search out facts from the record supporting those arguments. *See, e.g., Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1479-80 (6th Cir. 1989) (citing *Frito-Lay, Inc. v. Willoughby*, 863 F.2d 1029, 1034 (D.C. Cir. 1988)) ("the trial court no longer has a duty to search the entire record to establish that it is bereft of a genuine issue of material fact"); *see also InterRoyal Corp. v. Sponseller*, 889 F.2d 108, 111 (6th Cir. 1989), *cert. denied* 494 U.S. 1091 (1990) ("A district court is not required to speculate on which portion of the record the nonmoving party relies, nor is it obligated to wade through and search the entire record for some specific facts that might support the nonmoving party's claim."). The parties are required to designate with specificity the portions of the record such that the court can "readily identify the facts upon which the . . . party relies[.]" *InterRoyal Corp.*, 889 F.2d at 111.

## II.   Factual Background

The undisputed facts are as follows. Raymond was employed by Renew beginning in late 2015 as a massage therapist. (Pl. Dep. at 48, ECF No. 35-3 at Pg

ID 703.)  On October 31, 2015, Raymond and Renew entered into an "Independent Contractor Agreement" ("2015 Agreement").[1]  (Ex. B, ECF No. 35-2; *see also* Pl. Dep. at 51, ECF No. 35-3 at Pg ID 704.)  The 2015 Agreement states in relevant part: "Contractor is an independent contractor and is not an employee, servant, partner or joint venturer of [Renew Therapeutic Massage, Inc.]"  (Ex. B, ECF No. 35-2 at Pg ID 686, ¶ 3.)

The 2015 Agreement provides that Renew shall pay a contractor per massage according to the length and massage location and an extra amount if a client needs help transferring onto the massage table.  (*Id.*, ¶ 2.)  However, it only defines compensation for 60-minute or 90-minute massages.  (*Id.*)  It contains a "Confidentiality and Competition" clause stating in part, "[d]uring the term of this Agreement and for a period of two (2) years following such termination, the Contractor shall not solicit any of [Renew Therapeutic Massage, Inc.]'s clients, . . . rehabilitation facility(ies), . . . case manager(s) . . .nor [sic] . . . business contacts." (*Id.* at Pg ID 687, ¶ 6.)

On September 28, 2016, Raymond signed an "Independent Services Agreement" ("2016 Agreement") between Renew and Two Handed Heart LLC, a company Raymond established in July 2016.  (Ex. E, ECF No. 35-5 at Pg. ID 784;

---

[1] Raymond signed the 2015 Agreement using her maiden name, "Marie Cierpial." (*See* Pl. Dep. at 6, ECF No. 35-3 at Pg ID 693 (explaining that she was previously known as Marie Elizabeth Cierpial.).)

5

*see also* Pl. Dep. at 53-55, ECF No. 35-3 at Pg ID 705.)  The 2016 Agreement

defines the employment relationship as follows:

> 4.  *Independent Contractor.*  The relationship between
> the parties is that of independent contracting parties.
> Nothing contained in this Agreement or course of
> conduct between the parties will be considered to form a
> partnership, employment relationship, or any other
> relationship except that of independent contractor.  In
> performance of the Services under this Agreement,
> Therapist is an independent contractor with the authority
> to control and direct the performance of the Services.

(Ex. E, ECF No. 35-5 at Pg. ID 787, ¶ 4.)

Exhibit C of the 2016 Agreement is a "Schedule of Fees" outlining the

payment of therapists, allowing Renew to pay the therapist by billable units, in

quarter-hours, multiplied by a base rate for rendering services and documenting the

related notes regarding the services.  (*Id.* at Pg ID 792.)  Like the 2015 Agreement,

the compensation rate of the 2016 Agreement was based on the location where

services were provided.  (*See id*.)  The Schedule of Fees also requires that

therapists submit their availability to Renew's office manager, Heather James, via

email before the work week and agree to be available for those times they

indicated they were open.  (*Id*.)  If therapists' availability changes, the 2016

Agreement further requires them to "notify Renew as soon as possible," but

explains that "Renew cannot guarantee amendment or change to any prior

appointments."  (*Id*.)  The 2016 Agreement also contains confidentiality,

restrictions on competition, non-solicitation, and indemnification clauses.  (*Id.* at Pg ID 787-88, ¶¶ 7, 8, 9, 11.)  Exhibit B of the 2016 Agreement contains "Performance Standards" requiring in part for therapists to wear uniforms and arrive at least 10 minutes before scheduled appointments.  (*Id.* at Pg ID 790.)

The term of the 2016 Agreement was to last one year following its "Effective Date" but allowed for automatic renewal of consecutive one-year periods.  (*Id*. at Pg ID 784, ¶ 3.)  This same clause permitted termination of the agreement "upon notice of either party within [fourteen (14)] days . . . ."  *Id*.  In December of 2017, Renew exercised its right to terminate the independent contractor agreements with its LMTs.  (N. Catt Dep. at 34-35, ECF No. 35-4 at Pg ID 758.)  However, Renew offered to rehire therapists as "employees" under a new employment agreement that established them as W-2 employees.[2]  (*Id*.)  Renew also offered the therapists insurance and a pre-tax retirement savings plan.  (*Id*. at 113-14, Pg ID 778.)  The therapists' job duties remained the same under the new agreement.  (*Id*.)

Raymond informed Renew that she would not agree to be re-hired under the proposed employment agreement and resigned effective December 22, 2017.  (Pl.

---

[2] In 2016, 2017, and 2018, Raymond declared her income on an IRS 1040 Schedule C for other business income, subtracting her business expenses from her taxable income and showing a taxable profit.  (Ex. G, ECF No. 35-7).  Raymond paid "self-employment tax" on that profit.  (Ex. H, ECF No. 35-8).

7

Dep. at 78, 82, ECF No. 35-3 at Pg ID 711-12; *see also* Raymond's Resignation

Letter, Ex. J, ECF No. 35-10.)  Raymond explained that she resigned because of

the decrease in pay.  (Pl. Dep.  at 77-78, ECF No. 35-3 at Pg ID 711.)  Prior to her

departure, Raymond wrote to clients she services to flag her last day of

employment.  (*Id*. at 84, Pg ID 712.)  On December 22, 2017, the same date of

Raymond's resignation, an attorney for Renew sent a legal notice and a cease-and-

desist letter to Raymond regarding "Breach of Contract and Violation of Non-

Compete and Solicitation agreement."  (ECF No. 34-6.)  The legal notice

references Raymond's solicitation of various parties but specifically names James

Saltalamacchia and Michele Paradis.  (*Id*. at Pg ID 605.)  Saltalamacchia and

Paradis were coworkers of Raymond at Renew.  (N. Catt. at 59-61, ECF No. 35-4

at Pg ID 764-65.)

     After leaving Renew, Raymond began performing services at the Rainbow

Center under her company Axxis Massage LLC ("Axxis"), starting the last week of

December 2017.  (Pl. Dep. at 18, ECF No. 35-3 at Pg ID 696.)  In early 2018,

Raymond also began performing services at Eisenhower Center under Axxis.  (*Id*.

at 16, Pg ID 695.)  At Eisenhower Center, she was performing services for a

previous client that she had serviced with Renew upon request from the client's

case manager.  (*Id*. at 17, Pg ID 696.)

In 2018, Catt hired another attorney to investigate Raymond's business practices.  (N. Catt Dep. at 77, ECF No. 35-4 at Pg ID 769.)  On March 27, 2018, the attorney advised Raymond of his investigation.  (Ex. F, ECF No. 34-7.)  The attorney also sent Raymond a proposed "Verified Complaint" against her.  *Id*.  A certified public accountant ("CPA") reviewed previous billing reports for specific clients to determine the estimated annual loss from Raymond's solicitation of Renew's clients to be approximately $90,360.  (Ex. J., ECF No. 34-11.)

## III.   Applicable Law & Analysis as to Raymond's Complaint

### A.   Raymond's FLSA Overtime Violation Claim

In Count I of the Complaint, Raymond alleges that Defendants violated the FLSA when it misclassified her as an independent contractor and failed to pay her overtime compensation.  (Compl. ¶¶ 41, 47, ECF No. 1 at Pg ID 6, 7.)  Defendants argue that Raymond was an independent contractor rather than an employee, and therefore not entitled to overtime pay.  (Defs.' MSJ, ECF No. 33 at Pg ID 505.)

The FLSA prohibits employers from permitting employees to work more than forty hours in any workweek without compensation at a rate "not less than one and one-half times the regular rate at which he [or she] is employed."  29 U.S.C. § 207(a)(1).  However, "[u]nder the FLSA, only employees are entitled to overtime and minimum-wage compensation. . . . Independent contractors do not enjoy [the] FLSA's protections."  *Keller v. Miri Microsystems LLC*, 781 F.3d 799,

9

806 (6th Cir. 2015) (citing cases).  Courts "must look to see whether a worker, even when labeled as an 'independent contractor,' is, as a matter of 'economic reality,' an employee."  *Id*. at 804 (6th Cir. 2015) (citing *Rutherford Food Corp. v. McComb*, 331 U.S. 722, 729, (1947)).  Contractual intention is not dispositive in a court's analysis.  *Keller*, 781 F.3d at 808. [3]  Therefore, the fact that Raymond's contracts with Renew label her as an "independent contractor" is not dispositive.

The Sixth Circuit has identified six factors in its economic-reality test that courts should consider when deciding whether the plaintiff was an employee or independent contractor:

> 1) the permanency of the relationship between the parties;

> 2) the degree of skill required for the rendering of the services;

> 3) the worker's investment in equipment or materials for the task;

> 4) the worker's opportunity for profit or loss, depending upon his skill; . . .

> 5) the degree of the alleged employer's right to control the manner in which the work is performed[; and] . . .

> [6)] whether the service rendered is an integral part of the alleged employer's business. [4]

---

[3] "The reason [why contractual intention is not dispositive] is simple: The FLSA is designed to defeat rather than implement contractual arrangements."  *Id*. (quoting *Imars v. Contractors Mfg. Servs., Inc.*, 165 F.3d 27 (6th Cir. 1998).)

[4] Neither party proffers argument as to the third and sixth factors.  Thus, the Court assumes those factors are not relevant to its consideration.  However, Defendants argue generally that where an "individual declares self-employment on a tax

*Id.* at 807 (quoting *Donovan v. Brandel*, 736 F.2d 1114, 1117 (6th Cir. 1984)). The Sixth Circuit has advised courts to "also consider whether the business had 'authority to hire or fire the plaintiff,' and whether the defendant-company 'maintains the plaintiff's employment records.'" *Id.* (quoting *Ellington*, 689 F.3d at 555). "No one factor is determinative." *Id.* (citing *Brandel*, 736 F.2d at 1120 ("A central question is the worker's economic dependence upon the business for which he is laboring.")) As such, courts "address each factor in turn with an eye toward the ultimate question—[the worker's] economic dependence on or independence from [the alleged employer]." *Id.*

"Whether a FLSA plaintiff is an employee is a mixed question of law and fact." *Keller*, 781 F.3d at 806 (citing *Lilley v. BTM Corp.,* 958 F.2d 746, 750 n.1 (6th Cir.1992) ("[w]here there is a genuine issue of fact or conflicting inferences can be drawn from the undisputed facts . . . the question is to be resolved by the finder of fact in accordance with the appropriate rules of law.")); *see also Brock v. Superior Care, Inc*., 840 F.2d 1054, 1059 (2d Cir. 1988) ("The existence and

---

return, courts have found independent contractor status." (Defs.' MSJ, ECF No. 33 at Pg ID 515, 521) (citing cases).) A court in this district found tax filings relevant to the economic reality factor of a worker's investment. *Rounds v. Kare,* No. 16-13170, 2018 WL 1089597, at *6 (E.D. Mich. Feb. 26, 2018). The Court can consider the tax treatment of Raymond; however, this does not alter the Court's finding that issues of fact preclude it from concluding that Raymond was an employee or an independent contractor

degree of each factor is a question of fact while the legal conclusion to be drawn from those facts—whether workers are employees or independent contractors—is a question of law.").  As explained below, when considering the evidence in the light most favorable to Raymond, there are genuine factual disputes regarding the economic reality factors and ultimately whether Raymond was an employee or an independent contractor.  Accordingly, summary judgment of this misclassification claim is inappropriate.  *See Keller*, 781 F.3d at 804-05.  In this situation, "it is the task of the trier of fact to review the evidence and weigh the factors to decide whether the plaintiff-worker is economically dependent upon the defendant-company."  *Id*. at 805.

### i.      Permanency of the Relationship

Independent contractors "often have fixed employment periods and transfer from place to place as particular work is offered to them, whereas 'employees' usually work for only one employer and such relationship is continuous and indefinite in duration."  *Keller*, 781 F.3d at 807 (quoting *Baker v. Flint Eng'g & Constr. Co*., 137 F.3d 1436, 1442 (10th Cir. 1998)).  "If a worker has multiple jobs for different companies, then that weighs in favor of finding that the worker is an independent contractor."  *Id.* (citing *Brandel*, 736 F.2d at 1117).  Regarding this factor, courts may look to the length and exclusivity of the working relationship.  *Keller*, 781 F.3d at 807 (describing as "length and regularity . . . but even short,

exclusive relationships between the worker and the company may be indicative of an employee-employer relationship.") (citation omitted); *Acosta v. Off Duty Police Servs., Inc.*, 915 F.3d 1050, 1058 (6th Cir. 2019) (describing as "length and consistency").

It is undisputed that Raymond worked as a LMT for Defendants from October 2015 to December 2017—approximately two years in total. This is a significant period of time. *See Gilbo v. Agment, LLC*, 831 F. App'x 772, 776 (6th Cir. 2020) (finding that plaintiffs were not transient workers and that the length of their employment of seven months to a year was significant). Further, during her employment, Raymond worked exclusively for Defendants. (Pl. Dep. at 72-73, 114, ECF No. 35-3 at Pg ID 709-08, 720.)

Defendants point out, however, that "[Raymond] could [have] work[ed] for other companies but simply chose not to avail herself of the opportunity." (Defs.' MSJ, ECF No. 33 at Pg. ID 519, 522.) This argument proves useful only if independent contractor status automatically attaches to a worker who had (or could have had) more than one employer. The Sixth Circuit has pointed out that "[e]mployees may work for more than one employer without losing their benefits under the FLSA.'" *Keller*, 781 F.3d at 808 (quoting *Brock v. Superior Care, Inc.*, 840 F.2d 1054, 1060 (2d Cir. 1988)). And "this fact is most relevant when it suggests that a worker tends to 'transfer from place to place as particular work is

13

offered to [her].'"  *Acosta*, 915 F.3d at 1058 (quoting *Keller*, 781 F.3d at 807).  In this case, Plaintiff "did not bounce from one company to another in search of new work" and, thus, did not engage in "the kind of itinerant work that independent contractors ordinarily perform."  *Id*.

Schedule variability—which includes the control Raymond exercised over the number of days per week she worked and how many jobs she took each day—can serve as an indicator of employee status, where the parties treat the relationship as an exclusive one.  *Keller*, 781 F.3d at 808.  The *Keller* court found that the plaintiff was an employee where "he never turned down job assignments from the defendant, and he believed that he could be terminated for intransigence."  *Id*.  The court further held that a workers' schedule, including factors that affect an individual's working hours and ability to perform other work, could be indicative of exclusivity.  *Id*.

There is a factual dispute about variability in Raymond's schedule. Raymond felt that she could not turn down work, although she admitted this was never explicitly expressed by Renew and was her subjective belief.  (Pl. Dep. at 75, ECF No. 35-3 at Pg ID 710.)  Raymond also felt that if she was unavailable and did not find someone to fill in for her, she would "catch grief" for it and would not be given favorable scheduling.  (*Id*. at 73, 108-09, Pg ID 710, 718-19.)  Towards the end of her working relationship with Renew, Renew scheduled Raymond to

14

work times that were not conducive to her schedule and not based on her

availability.  (*Id*. at 107-08, Pg ID 718.)  Moreover, Raymond stated she was

unable to accept other engagements due to her work schedule, that is, because of

the time she spent servicing clients, commuting, and writing documentation for

Renew.  (*Id*. at 72-73, 114, Pg ID 709-08, 720.)  These facts suggest permanence

and minimal schedule variability.

James, on the other hand, testified that scheduling was based on the

therapists' availability.  (James Dep. at 11, ECF No. 35-1 at Pg ID 637.)

Raymond's testimony also supports this contention as she stated that Renew did

not require her to be available on certain days.[5]  Further, the 2016 Agreement

explains that after therapists submit their availability that they were agreeing to be

available for those times they indicated they were open.  (Ex. E, ECF No. 35-5 at

Pg. ID 792.)  As such, it appears that Raymond may have exercised control over

---

[5] Q. Did you understand that there was a requirement that you had to work certain
days?
A. Based on scheduling, yes.
Q. Well, who set the schedules?
A. We gave availability --
Q. Okay.
A. -- but ultimately the schedules were issued to us around what the client's
availability was, so there wasn't really...
Q. Well, but if you said "I'm not available this day," you wouldn't work that day,
right?
A. Correct.
Q. Okay.
(Pl. Dep. at 104-105, ECF No. 35-3 at Pg ID 717-18.)

the time and number of days per week she was available to work. *Cf. Benion v. LeCom, Inc.*, 336 F. Supp. 3d 829, 848 (E.D. Mich. 2018) (finding employee status where plaintiffs were required to work six days a week, could not refuse an assignment without fear of discipline, and were often denied time off.)

Finally, Raymond argues that the 2015 and 2016 Agreements restricted her employment opportunities making her relationship with Renew an exclusive one. (ECF No. 37 at Pg ID 1320.)  The Agreements, however, only limit Raymond's ability to solicit Renew's clients.  (*See* Ex. B, ECF No. 35-2 at Pg ID 687, ¶ 6; Ex. E, ECF No. 35-5 at Pg. ID 786, ¶¶ 8-9.)  They do not limit Raymond's ability to perform massage therapy or compete.  Accordingly, the clauses do not support Raymond's argument that this was an exclusive working arrangement.

In sum, Raymond's length of employment and exclusivity with Renew suggests employee status.  However, the following facts regarding Raymond's schedule variability are disputed.  Raymond's testimony suggests a permanent relationship because she subjectively believed that she could not decline appointments, and her schedule prevented her from performing massage services for other companies.  On the other hand, she sent her availability to Renew for scheduling each week, and she was never explicitly prohibited by Renew from working for other clients or companies.  As such, it is conceivable that Raymond could have simply chosen not to work on certain days to pursue her own business.

16

These characteristics accordingly weigh in favor of impermanence.  As such, the Court finds issues of material fact precluding a determination of employee or contractor status with respect to this factor.

### ii.    Degree of Skill

This factor focuses on whether an individual's profits increased because of the "initiative, judgment[,] or foresight of the typical independent contractor,' or whether his work 'was more like piecework.'" *Keller*, 781 F.3d at 809 (quoting *Rutherford Food Corp. v. McComb*, 331 U.S. 722, 730 (1947)).  "It is also important to ask how the worker acquired his [or her] skill." *Id*.  An independent contractor is more likely to have gained the relevant skill through "formal education, an apprenticeship, or years of experience . . . ." *Id*.  "On the other hand, if the worker's training period is short, or the company provides all workers with the skills necessary to perform the job, then that weighs in favor of finding that the worker is indistinguishable from an employee." *Id*.

Raymond testified that she received a certificate from a myomassology institute prior to working for Renew.  (Pl. Dep. at 22, ECF No. 35-3 at Pg. ID 697.)  Further, nothing in the record indicates that Renew trained Raymond to perform her work.  As such, the facts are undisputed and Raymond's specialized training before working with Renew weighs in favor of independent contractor status.

### iii.    Profit and Loss

The Court must consider whether Raymond had an opportunity for greater profits based on her management and technical skills. *See Keller*, 781 F.3d at 812 (citing *Brandel,* 736 F.2d at 1119). Renew was responsible for scheduling appointments for Raymond. As noted earlier, this was generally based on Raymond's availability. However, Raymond testified that Renew would give the "best" and "most" appointments to those therapists who performed the best or accepted more jobs. (Pl. Dep. at 108-09, ECF No. 35-3 at Pg ID 718-19.) Although unclear what Raymond means by "best" appointments, the Court infers for the purpose of analysis that Raymond means that therapists would be given more appointments with higher pay. Moreover, the Agreements allow for variable compensation based on location and massage length. (*See* Ex. B, ECF No. 35-2 at Pg ID 686, ¶ 3 (designating a pay increase for on-site locations); Ex. E, ECF No. 35-5 at Pg. ID 787 (designating pay at $15.38 per billable unit for massages performed at "special location[s]" as compared to a $10.38 base rate of pay.)) Accordingly, Raymond's testimony supports a possible finding that she could have increased her profits through her performance or by accepting more assignments. *But cf. Keller*, 781 F.3d at 813 (noting that the plaintiff had opportunities for higher profit where the service provided was more complex, but that this was not within the plaintiff's control and depended on scheduling and demand.)

However, Raymond also testified that the time she spent servicing clients, commuting, and writing documentation for Renew limited her ability to accept other engagements. *See id.* (finding that employee could not improve his efficiency due to the time required for installation, travel time, and time spent preparing and submitting paperwork.) Accordingly, the Court concludes that there is a material dispute of fact as to whether Raymond could have increased her profitability had she improved her performance and accepted more assignments.

### iv.   Right to Control

This factor "focuses on the level of control that the employer has over its workers[,] as well as whether the employer 'retains the right to dictate the manner' of the worker's performance." *Gilbo*, 831 F. App'x at 772 (quoting *Acosta*, 915 F.3d at 1060). "In analyzing this factor, courts have examined things like uniform requirements, general rules on workplace conduct, . . . and control over customers of a business." *Id.* (citations omitted); *see also Swinney v. AMcomm Telecomm., Inc.*, 30 F. Supp. 3d 629, 638 (E.D. Mich. 2014) (quoting *Scruggs v. Skylink, Ltd.*, No. CIV.A. 3:10-0789, 2011 WL 6026152, at *3 (S.D. W. Va. Dec. 2, 2011) ("Courts have considered . . . whether workers may choose how much and when to work, …uniforms, and how closely their work is monitored and controlled by the purported employer."))

19

As described above, Raymond may have exercised some control over her schedule by submitting her availability. "But a worker's ability to set his [or her] own hours and vacation schedule 'is not sufficient to negate control.'" *Keller*, 781 F.3d at 814 (quoting *Lilley*, 958 F.2d at 750). Raymond also had autonomy in controlling the manner of how her massages were performed without supervision.[6] *Cf. Benion*, 336 F. Supp. 3d at 852 (finding that the employer "routinely inspected the plaintiffs' work and would dock their pay if the job was not up to [the employer's] standards."). As a LMT, Raymond performed services according to how she was trained and not at Renew's direction. (*See* N. Catt Dep. At 109, ECF No. 35-4 at Pg ID 777 (explaining the job duties of Renew's LMTs as doing what they were taught in school and explaining that she did not tell them what to do.); *see also Acosta*, 915 F.3d at1062 (noting that there was a limited need to exercise power over sworn officers who already have far more experience and training than necessary to perform work assigned.); *but see Keller*, 781 F.3d at 814 (finding that a jury could find an employer exercised control when it accompanied an employee to appointments during training, insisted jobs be performed in accordance with certain specifications, required certification on those specifications, and supplied employees with instructions on how to perform their job.) Since nothing in the

---

[6] The Court notes that the 2015 Agreement references a "RTM Therapist Manual", however, the manual does not appear in the record. (*See* Ex. B, ECF No. 35-2 at Pg ID 686, ¶ 1.)

record suggests any supervision, training, or instructions regarding how Raymond

was to perform services, the facts suggest limited control, if any, over how

Raymond performed her work.

Additionally, Renew's therapists could voluntarily use a group

communications application called "Band". (James. Dep. at 23-24, ECF No. 35-1

at Pg ID 640.)  Renew used the communication to welcome new therapists,

announce and schedule team meetings, and communicate policies.  (*Id*. at 26-27,

Pg ID 641.)  Renew held quarterly meetings for therapists to discuss any issues

they were having.  (N Catt. Dep. at 110, ECF No. 35-4 at Pg ID 777.)  However,

these meetings were not mandatory and there were no adverse employment actions

if not attended.  (*Id*.); *but cf. Swinney*, 30 F. Supp. 3d at 645 (finding that

employer's use of backcharges to employees' paychecks for quality control, but

also for punishment for being late or not attending meetings evidence control.)

The use of Band and Renew's meetings appear to be voluntary, so the Court finds

that these facts do not suggest Renew's control over Raymond.

However, the record supports that Renew exercised some control over

Raymond regarding uniforms and arrival time.  Pursuant to the 2015 and 2016

Agreements, Raymond was required to wear a uniform identifying her as an

authorized representative and to maintain a "professional appearance".  (Ex. B,

ECF No. 35-2 at Pg ID 686, ¶ 1; Ex. E, ECF No. 35-5 at Pg. ID 790.)  Initially,

Renew required therapists to wear blue scrubs without any logo and a nametag. (Pl. Dep. At 104, ECF No. 35-3 at Pg ID 717.)  Later, Renew required that therapist wear t-shirts or hooded sweatshirts that said, "Renew". (*Id*.)  Raymond also testified that the uniform requirement made it difficult to accept other work because she would need to go home and change. (*Id*. at 103.)  A court in this district found that required uniforms and logos on employee vehicles were indicative of control. *Benion*, 336 F. Supp. 3d at 852; *see also Keller*, 781 F.3d at 815-16 ("A uniform can often be a sign of control . . . .")

There are issues of fact regarding the required early arrival time before appointments; however, it remains undisputed that Renew expected Raymond to arrive early to appointments.  The 2016 Agreement "Performance Standards" require therapists to arrive at least 10 minutes before scheduled appointments. (Ex. E, ECF No. 35-5 at Pg. ID 790.)  James testified that Renew's therapists were not required or expected to arrive thirty minutes early. (James Dep. at 11, ECF No. 35-1 at Pg ID 637 *Id*. at 14-15, Pg ID 638.)  Catt stated that therapists were not threatened with discipline for not arriving early, but if therapists wanted to do their job right, they should arrive a few minutes early. (N. Catt Dep. at 116, ECF No. 35-4 at Pg ID 779.)  Catt later admitted that a communication from James advised therapists to please arrive to appointments 30 minutes before scheduling to "open up, turn the heat up in the office, turn bed warmer on, and not be rushed." (N. Catt

Dep. Cont. at 174-75, ECF No. 37-2 at Pg ID 1351.)  The communication added

that "she would like the ambiance set!"  (*Id*. at 175.)  She explained that it was not

mandatory for therapists to arrive early and that therapists were not paid for this

time.  (*Id*.)  Raymond explained that she was not compensated for her time

showing up early to appointments.  (Pl. Decl., ECF No. 37-4.)

In short, the Court finds that Renew did not exercise significant control over

how Raymond performed the services and did not require the use of Band or

attendance at team meetings.  However, it appears that Renew did exercise control

over Raymond with its performance standards, including but not limited to

uniforms and early arrival at appointments.  As such, there are issues of fact that

preclude the Court from determining employee or contractor status as to the factor

of control.

### v.    Other Arguments

The Sixth Circuit has held that "[p]ersons employed in a 'bona fide . . .

professional capacity,' . . .  are exempted from the overtime pay requirements."

*Elwell v. Univ. Hosps. Home Care Servs.*, 276 F.3d 832, 837 (6th Cir. 2002) (citing

29 U.S.C. § 213(a)(1)).  Defendants argue that Raymond was exempt from

overtime wages as she is employed in a "bona fide professional capacity."  (Defs.'

MSJ, ECF No. 33 at Pg ID 523-24.)  To qualify as a bona fide professional, an

employee must be:

(1) Compensated on a salary or fee basis pursuant to § 541.600 at a rate of not less than $684 per week . . . exclusive of board, lodging or other facilities; and

(2) Whose primary duty is the performance of work:

(i) Requiring knowledge of an advanced type in a field of science or learning customarily acquired by a prolonged course of specialized intellectual instruction[.]

. . .

29 C.F.R. § 541.300(a).  Defendants first argue that Raymond was compensated on a fee basis.  (Defs.' MSJ, ECF No. 33 at Pg ID 522-23 (citing 29 C.F.R. § 541.605(a)).)

Under 29 C.F.R. § 541.605(a) "[a]dministrative and professional employees may be paid on a fee basis, rather than on a salary basis.  An employee will be considered to be paid on a 'fee basis' within the meaning of these regulations if the employee is paid an agreed sum for a single job *regardless of the time required for its completion*."  (emphasis added).  Raymond testified that Renew paid her hourly for the time she spent performing a massage.  (Pl. Dep. at 46-47, ECF No. 35-3 at Pg ID 703.)  Further, Raymond testified that appointment lengths would vary in time.  (*Id*. at 72.)  As such, Raymond was not paid based on the job and does not qualify for the bona fide professional exemption.

Moreover, Raymond's work for Renew does not satisfy the second requirement of the bona fide professional test that her primary job duty require

"knowledge of an advanced type in a field of science or learning customarily acquired by a prolonged course of specialized intellectual instruction." 29 C.F.R. § 541.300(a)(2). To meet this "learned professional" requirement, Raymond must satisfy the primary duty test which includes the following elements: "(1) [t]he employee must perform work requiring advanced knowledge; (2) [t]he advanced knowledge must be in a field of science or learning; and (3) [t]he advanced knowledge must be customarily acquired by a prolonged course of specialized intellectual instruction." 29 C.F.R. § 541.301(a). Courts have found that the work of a licensed practical nurse does not require a specialized advanced degree and, therefore, that such workers are not exempt from the FLSA's overtime pay requirements. *See Isett v. Aetna Life Ins. Co.*, 947 F.3d 122, 128 (2d Cir. 2020) (holding that "licensed practical nurses or other similar health care employees generally do not qualify as exempt learned professionals because possession of a specialized advanced academic degree is not a standard prerequisite for entry into such occupations."); *see also Adkins v. Phoenix Rising Behav. Healthcare & Recovery Inc.*, No. 5:15CV922, 2016 WL 5661617, at *4 (N.D. Ohio Sept. 30, 2016.) (quoting 29 C.F.R. § 541.301(e)(2)) ("licensed practical nurses are excluded from the exemption because 'possession of a specialized advanced academic degree is not a standard prerequisite for entry into such occupations.'"). However, the Sixth Circuit has held that a bachelor's degree is not always required for the

25

exemption to apply, but that there must be some other combination of educational requirements to fulfill the § 541.301(a)(3) requirements. *See Rutlin v. Prime Succession, Inc.*, 220 F.3d 737, 742 (6th Cir. 2000) (holding that requirements such as  one year of mortuary school, two years of college, passing national board tests covering embalming, pathology, anatomy, cosmetology, practice and apprenticeship for one year, and passing an exam given by the state, fulfilled the § 541.301(a)(3) requirements.)

Raymond has a high school diploma, no college credit courses, and a certificate from a Mysomassology Institute.  (Pl. Dep. at 21-22, ECF No. 35-3 at Pg ID 697.)  She is licensed by the State of Michigan.  (*Id.*)  Accordingly, it does not appear that there is evidence of "advanced knowledge [that] must be customarily acquired by a prolonged course of specialized intellectual instruction." 29 C.F.R. § 541.301(a)(3).  Further, Raymond's qualifications are not analogous to the rigorous combination of requirements found in *Rutlin* to satisfy § 541.301(a)(3).

Defendants argue that Raymond admits that the most hours she would work was 30 hours a week and therefore did not work enough hours to qualify for overtime.  (Defs.' MSJ, ECF No 33 at Pg ID 523-24.)  An employee who claims that he was not paid this overtime rate 'has the burden of proving that he performed work for which he was not properly compensated.'"  *Viet v. Le*, 951

F.3d 818, 822 (6th Cir. 2020) (quoting *Anderson v. Mt. Clemens Pottery Co.*, 328

U.S. 680, 687, (1946)).  However, employees need not recall their schedules with

perfect accuracy to survive a motion for summary judgment in an action asserting

violations of the FLSA's overtime provisions; they must only coherently describe

their day-to-day work schedules or the time it takes to complete their duties so that

a rational jury could find that they worked more than 40 hours in the weeks

claimed.  *Id.* at 826.  "In the absence of . . . employer records, however, a

plaintiff's testimony is enough to create a genuine issue of fact."  *Keller*, 781 F.3d

at 816.

Raymond, however, explained that Renew only compensated her for hands-

on time, which was about 30 hours a week, not for setup time for patients or the

time spent working from home writing notes or progress reports to bill for the

services she provided.  (Pl. Dep. at 72, 114, ECF No. 35-3 at Pg ID 710, 720.)

Raymond believed that she worked more than 80 hours in two weeks while

working for Renew.  (*Id*. at 114, Pg ID 720.)  Raymond also calculated the time

Renew did not compensate her in 2016 and 2017.  (Pl. Decl., ECF No. 37-4.)  As

such, a reasonable jury could find that Raymond worked enough hours when

combining her hands-on time with the additional time.  Therefore, Raymond

creates an issue of material fact as to whether she worked enough hours to be

entitled to overtime pay.

In sum, the Court does find that the "degree of skill" factor weighs in favor of contractor status.  However, there are issues of material fact regarding the other factors (Permanency, Opportunity for Profit or Loss, and Control) precluding the Court from determining as a matter of law that Raymond was a contractor or employee.

Raymond is not exempt from overtime compensation as a bona fide professional.  She presents sufficient evidence to create an issue of fact as to whether she worked more than 40 hours a week and did not receive overtime compensation.  As such, Defendants cannot show that they are entitled to summary judgment on Raymond's FLSA claim.

### B.     Plaintiff's Intentional Infliction of Emotional Distress Claim

To establish a claim of intentional infliction of emotional distress ("IIED") under Michigan law, "a plaintiff must show (1) extreme and outrageous conduct, (2) intent or recklessness, (3) causation, and (4) severe emotional distress." *Lewis v. LeGrow*, 670 N.W.2d 675, 689 (Mich. Ct. App. 2003) (internal quotation marks and citations omitted).  "A plaintiff can show that a defendant specifically intended to cause a plaintiff emotional distress or that a defendant's conduct was so reckless that 'any reasonable person would know emotional distress would result.'" *Id.* (quoting *Haverbush v. Powelson,* 551 N.W.2d 206 (Mich.App. 1996)).  The Michigan Supreme Court has considered conduct "extreme and outrageous" only if

it is "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." *Roberts v. Auto-Owners Ins. Co.*, 374 N.W.2d 905, 908-09 (1985) (quoting Restatement (Second) of Torts § 46 (1965)).

Defendants seek summary judgment as to this claim, arguing that (i) "Plaintiff alleges no facts that she suffered any emotional distress"; (ii) "Plaintiff's Complaint is also devoid of any assertions that Defendants had the required intent or recklessness to cause emotional distress"; and (iii) "Plaintiff further fails to allege conduct which rises to the level of "extreme and outrageous . . . ." (Defs.' MSJ, ECF No. 33 at Pg. ID 526-27.)  Raymond presents evidence to show that she suffered severe emotional distress due to Defendants' alleged conduct in the form of anxiety, lack of sleep, high blood pressure, and complications with her pregnancy.  (*See* Pl. Dep. at 124-26, ECF No. 35-3 at Pg ID 722-23.)  However, the conduct alleged was not "extreme and outrageous."

Raymond first argues that Renew's refusal to compensate her approximately $1,300 for her last week of work of services performed, where she is the sole provider of her family, constitutes extreme and outrageous conduct.  (ECF No. 37 at Pg ID 1335; *see also* Pl. Dep. at 120, 124, ECF No. 35-3 at Pg ID 721-22.)  Such conduct cannot be deemed "extreme" or "outrageous", that is "to go beyond all possible bounds of decency."  *Roberts*, 374 N.W.2d at 908-09.

Second, Raymond argues that Defendants' filing of their counterclaim was in retaliation to her filing her lawsuit and was extreme and outrageous. (ECF No. 37 at Pg ID 1336.) Raymond never sought to amend her Complaint to add this as a basis for her claim of IIED. (*See* ECF No. 1.) In any event, such conduct does not constitute extreme and outrageous conduct. To hold as much might preclude parties from asserting compulsory counterclaims in response to a plaintiff's lawsuit. Therefore, Defendants are entitled to summary judgment with respect to Raymond's IIED claim (Count II).

For these reasons, the Court is granting part and denying in part Defendants' summary judgment motion in that it is denying summary judgment as to Raymond's FLSA claim (Count I) and granting summary judgment as to her IIED claim (Count II).

## IV.    Applicable Law & Analysis as to Defendants' Counter Claims

In their Counter-Complaint, Defendants allege a breach of the non-solicitation agreement and a violation of the MUTSA. (Def. Countercl. ¶¶ 18, 20, ECF No. 6 at Pg ID 27.) Raymond contends that summary judgment is appropriate because Defendants fail to establish a statutory trade secret or any misappropriation of a trade secret. (Pl.'s MSJ, ECF No. 34 at Pg ID 543-44.) Further, Raymond contends that there is no evidence she breached the agreements. (*Id.* at Pg ID 549-50.)

## A.     Misappropriation Claim

A trade secret "means information, including a formula, pattern, compilation, program, device, method, technique, or process . . . ."  Mich. Comp. Laws § 445.1902(d).  To be protected under the statute, MUTSA requires that a trade secret both: (1) derives independent economic value, and (2) is the subject of efforts to maintain its secrecy.  *Id*.  Michigan courts use the following factors to determine if information is a trade secret:

> (1) extent to which information is known outside of owner's business, (2) extent to which information is known by employees and others involved in business, (3) extent of measures taken to guard secrecy of information, (4) value of information to owner and competitors, (5) amount of effort and money expended in developing information, and (6) ease or difficulty with which information could be properly acquired or duplicated by other.

*Wysong Corp. v. M.I. Indus.*, 412 F. Supp. 2d 612, 626 (E.D. Mich. 2005) (quoting *Compuware Corp. v. Serena Software Int'l, Inc.,* 77 F.Supp.2d 816, 820 (E.D.Mich.1999)).  Determining whether information is a trade secret is a fact-specific inquiry; however, this district has held that customer lists are trade secrets when bound by a confidentiality agreement.  *See Id.* at 629 (citing *Hayes–Albion,* 364 N.W.2d at 615).) (holding that "customer lists developed by a former employee and information relating to a customer's needs are not 'trade secrets' under the MUTSA, . . . unless the employee is bound by a confidentiality agreement.") (internal citation omitted)

Defendants maintain in their response brief that the trade secret at issue that Raymond used in violation of MUTSA is Renew's client list and the corresponding confidential information.  (ECF No. 36 at Pg ID 1044.)  Further, in Renew's interrogatory responses, trade secrets are defined specifically as "[c]ustomer lists and specific customer information including [Protected Health Information]."  (ECF No. 34-8 at Pg ID 616.)

Raymond argues that the customer list, amongst other things, is not a trade secret.  (Pl.'s MSJ, ECF No. 34 at Pg ID 545-46.)  Raymond specifically states, "there is nothing improper in an employee establishing his own business and communicating with customers for whom he had formerly done work in his previous employment."  (ECF No. 38 at Pg ID 1385 (citing *Hayes-Albion v. Kuberski*, 364 N.W.2d 609, 615 (Mich. 1984).)  However, the Michigan Supreme Court held in *Hayes-Albion* that while the information an employee obtained from customer contact, including the particular needs of clients, "is not a trade secret at common law, that an employer may have a protectable interest in the information . . . ."  *Hayes-Albion*, 364 N.W.2d at 615.  The court further held that money damages were appropriate for use of the information in violation of an agreement.  *Id*. (internal footnote omitted).  Here, Renew took steps to protect their information, including its customer list, with the 2015 and 2016 Agreements.

Further, courts have considered the ease or difficulty with which information could be properly acquired or duplicated by others. "Under Michigan law, a trade secret cannot consist of 'information which is readily ascertainable, i.e., capable of being acquired by competitors or the general public without undue difficulty or hardship.'" *Wysong Corp.*, 412 F. Supp. 2d at 627. Defendants assert that the customer list included customers' residential information, specific case managers and their contact information, prescriptions, and insurance information. (ECF No. 36 at Pg ID 1045.) As such, the information was not readily ascertainable. *See also Innovation Ventures, L.L.C. v. Aspen Fitness Prod., Inc.*, No. 11-CV-13537, 2015 WL 11071470, at *6 (E.D. Mich. Mar. 31, 2015) (holding that customer list was a protected trade secret when the employer took steps to ensure its secrecy and the list had information beyond content generally known to the public.). The Court finds that the contact list and corresponding information constitute a trade secret under Michigan law.

To succeed on a claim for misappropriation of a trade secret under Michigan law, a plaintiff must prove: "1) the existence of a trade secret; 2) its acquisition in confidence; and 3) the defendant's unauthorized use of it." *Utilase, Inc. v. Williamson*, Nos. 98-1233, 98-1320, 1999 WL 717969, at *6 (6th Cir. Sept. 10, 1999 (citing *Rothschild v. Ford Motor Co.*, 2 F. Supp. 2d 941, 950 (E.D. Mich. 1998)). Under MUTSA, "misappropriation" means one of the following:

(i) Acquisition of a trade secret of another by a person who knows or has reason to know that the trade secret was acquired by improper means.

(ii) Disclosure or use of a trade secret of another without express or implied consent by a person who did 1 or more of the following:

(A) Used improper means to acquire knowledge of the trade secret.

(B) At the time of disclosure or use, knew or had reason to know that his or her knowledge of the trade secret was derived from or through a person who had utilized improper means to acquire it, acquired under circumstances giving rise to a duty to maintain its secrecy or limit its use, or derived from or through a person who owed a duty to the person to maintain its secrecy or limit its use.

(C) Before a material change of his or her position, knew or had reason to know that it was a trade secret and that knowledge of it had been acquired by accident or mistake.

Mich. Comp. Laws § 445.1902(b).

Raymond argues that there is no genuine issue of material fact that she misappropriated Defendants' trade secrets.  (Pl.'s MSJ, ECF No. 34 at Pg ID 546.) Defendants respond that Raymond's solicitation evidences the use or disclosure of Renew's trade secrets and creates an issue of material fact.

Prior to her departure, Raymond wrote clients she serviced to flag her last day of employment and directing them to Renew for questions about continuing massage therapy services.  (Pl. Dep at 84, ECF No. 35-3 at Pg ID 712.)  The letters contained Raymond's contact information and advised them to contact her directly

34

about rescheduling.  (*See* ECF No. 34-5.)  Raymond admitted that she had clients that she had formerly serviced at Renew, but that the clients contacted her and signed acknowledgments stating that they had "made the decision on their own to contract [her] for therapy."  (Pl. Dep. at 137-40, ECF No. 35-3 at Pg ID 726.)

Raymond's coworkers at Renew explained that Raymond had spoken with them about her plans to solicit Renew's clients, including the use of letters to clients.  Saltalamacchia states that on December 6, 2017, Raymond approached him before she left Renew.  (Saltamacchia Aff. ¶ 3, ECF No. 36-11 at Pg ID 1216.) Raymond told Saltalamacchia that she was looking into the legality of taking clients in light of the non-solicitation contract and that she planned to give clients a letter with her phone number.  (*Id*. ¶¶ 4, 5,7.)  Raymond also explained that she had spoken with case managers at Eisenhower Center before her departure and that several of the clients wanted to go with her as their therapist when she left Renew. (*Id*. ¶6.)  A second co-worker, Paradis, also provides an affidavit in which she states that she had a similar conversation with Raymond before her resignation from the company regarding Raymond's solicitation of clients.  (Paradis Aff. ¶¶ 3, 4, 5, ECF No. 36-12 at Pg ID 1219.)

Raymond argues that there is no evidence of solicitation of clients since Catt testified that her claim was based on the clients no longer receiving services from Renew, rather than Catt having actual knowledge that Raymond solicited them.

(Pl.'s MSJ, No. 34 at Pg ID 549-50); (*see also* N. Catt Dep. at 70-71, ECF No. 35-4 at Pg ID 767.)  However, Catt testified that she knew of at least one client Raymond contacted about continuing services through her but that he remained a client of Renew.  (N. Catt Dep. At 71-72, ECF No. 35-4 at Pg ID 767.)

Accordingly, there is a question of fact as to whether Raymond used Renew's trade secret to solicit clients.  As such, Raymond's motion is denied with respect to the misappropriation claim.  Raymond asks this Court to make a bad-faith determination under Michigan Complied Laws § 445.1905.  (Pl.'s MSJ, ECF No. 34 at Pg ID 550-53.)  Section 445.1905 states "[i]f a claim of misappropriation is made in bad faith . . . the court may award reasonable attorney's fees to the prevailing party."  There is no basis from which the Court could make a bad faith finding.  As set forth above, it concludes that the claim is not subject to summary judgment.  Further, as previously discussed, the Court does not find that the counterclaims were brought for purely retaliatory reasons and Raymond has presented no evidence in support of its argument that the claim was asserted by Defendants in bad faith.  *See McKesson Med.-Surgical Inc. v. Micro Bio-Medics, Inc.*, 266 F. Supp. 2d 590, 597 (E.D. Mich. 2003) (holding that "defendants have failed to persuade [the court] that there exists 'clear evidence' that this action was entirely without color and taken for improper purposes amounting to bad faith.")

**B.     Breach of Contract Claim**

Raymond also seeks summary judgment with respect to Defendants' breach of contract claim, asserting that there is no evidence of a breach of the non-solicitation provision.  (Pl.'s MSJ, ECF No. 34 at Pg ID 549-50.)  Raymond further asserts that Defendants have failed to provide a necessary causal link to establish damages.  (*Id.* at 548-49 (citing *Konica Minolta Bus. Sols., U.S.A., Inc. v. Lowery Corp.*, No. 15-11254 , 2020 WL 3791601, at *15 (E.D. Mich. July 7, 2020)) (holding that plaintiff's general reliance on drop in revenue failed to show which specific breach of an agreement caused the corresponding damages and therefore precluded it from summary judgment on the issue of liability.)

As previously stated, there is an issue of fact as to whether Raymond solicited Renew's clients as this could be a breach of the 2016 Agreement. Morover, there are additional issues of fact as to whether Raymond solicited Renew's employees.  The 2016 Agreement states that therapists agree for a period of 2 years following termination to not solicit any Renew employees.  (Ex. E, ECF No. 35-5 at Pg. ID 786, ¶ 9.)  Saltalamacchia states that on December 6, 2017, Raymond requested that he leave Renew and join her.  (Saltamacchia Aff. ¶ 9, ECF No. 36-11 at Pg ID 1216.)  Further, "[a]fter the conversation on December 6, 2017, [Raymond] contacted [him] by text message wanting to know if [he] decided to leave Renew to join her."  (*Id.* ¶ 10.)  Raymond, however, testified that she did not speak to Saltamacchia, or Paradis, regarding them working with her after she left

Renew.  (Pl. Dep. at 84-85, ECF No. 35-3 at Pg ID 712-13.)  As such, there is a

factual dispute regarding whether Raymond solicited Renew employees.

Finally, Raymond argues that Defendants have no evidence that they

suffered damages as a result of Raymond's alleged violations.  (Pl.'s MSJ, ECF

No. 34 at Pg ID 546-49.)  However, a CPA reviewed previous billing reports for

specific clients and determined the estimated annual loss from Raymond's conduct

to be approximately $90,360.  (Ex. J., ECF No. 34-11.)  The CPA's letter is based

on billings for five of Renew's clients, however, their names are redacted.  (*Id*.)

The CPA explains "the annual loss could reasonably be projected into subsequent

periods as long as they continued to be clients of [Renew]."  (*Id*.)  As such, there is

proof of damages and an issue of fact that precludes summary judgment as to

Defendants' claims.

For these reasons, the Court denies summary judgment to Raymond on

Defendants' counter claims as there is a question of fact as to whether Raymond

used Renew's trade secret to solicit clients and as to whether Raymond breached

the agreements.

For the reasons discussed above, the Court finds genuine issues of material

fact precluding summary judgment as to Defendants' counter claims.

Accordingly,

**IT IS ORDERED** that Raymond's Motion for Summary Judgment (ECF No. 34) is **DENIED**;

**IT IS FURTHER ORDERED** that Defendants' Motion for Summary Judgment (ECF No. 33.) is **GRANTED IN PART** and **DENIED IN PART** in that Raymond's claim for IIED is **DISMISSED WITH PREJUDICE**.

**IT IS SO ORDERED.**

s/ Linda V. Parker
LINDA V. PARKER
U.S. DISTRICT JUDGE

Dated: March 18, 2022